UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                  :
FB and EB, *individually and on behalf of LB*,          :
                                                                  :                    12 Civ. 1669 (PAE)
                                             Plaintiffs,         :
                                                                  :              OPINION & ORDER
                    -v-                                        :
                                                                  :
NEW YORK CITY DEPARTMENT OF EDUCATION          :
and DENNIS WALCOTT, in his official capacity as the     :
Chancellor of the New York City Department of Education,:
                                                                  :
                                             Defendants.       :
                                                                  :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

        Plaintiffs FB and EB (the "Parents"), individually and on behalf of their minor son, LB,

bring this action against the New York City Department of Education and its Chancellor, Dennis

Walcott (collectively, "DOE"), pursuant to the Individuals with Disabilities Education

Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. §§ 794 *et seq.*, and Article 89 of the New York State Education Law, N.Y.

Educ. Law §§ 4401 *et seq.*  The Parents seek review of a November 25, 2011, administrative

decision of the State Review Officer (the "SRO") that (1) annulled the decision of the Impartial

Hearing Officer (the "IHO"), concluding that the Individualized Education Program ("IEP")

developed for LB for the 2010–2011 school year violated his right to a free appropriate public

education ("FAPE") and (2) vacated the IHO's award of tuition reimbursement for LB's

unilateral placement at the Rebecca School during that year.  The parties have cross-moved for

summary judgment.

For the reasons that follow, the Court agrees with the SRO that the three specific deficiencies that the IHO found in LB's IEP, whether viewed singly or together, did not deny LB a FAPE.  Accordingly, summary judgment is granted for the DOE on LB's claims based on those specific issues.  However, because the SRO did not address the Parents' claims of other deficiencies in LB's IEP, the Court remands those issues to the SRO for review.

## I.  Background

### A.  Facts[1]

LB is a nine-year-old student classified with autism.  Pl. 56.1 ¶ 6; Def. 56.1 ¶ 1.  He has received services from New York City continuously from the age of two years old, first from the Department of Health and later from the DOE.  Pl. 56.1 ¶ 7.  Since kindergarten, beginning fall 2008, LB has attended the Rebecca School, a private therapeutic special education school.  *Id.* ¶ 8; Def. 56.1 ¶ 2.  For the 2008–2009 and 2009–2010 school years, the DOE has reimbursed the Parents for the tuition they paid for the Rebecca School, pursuant to settlements.  Pl. 56.1 ¶ 10.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion—specifically, the Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Pl. 56.1"), Dkt. 22; the Affidavit of Stephen Goldstein in Support of Plaintiffs' Motion for Summary Judgment ("Goldstein Aff."), Dkt. 21, and the exhibits attached thereto; the Defendants' Local Rule 56.1 Statement of Material Facts ("Def. 56.1"), Dkt. 26; and the administrative record from the proceedings below and attached exhibits, including, *inter alia*, the transcript from the hearing before the IHO ("IHO Tr."); the Decision of the IHO ("IHO Dec."), and the Decision of the SRO ("SRO Dec.").  Citations to a party's 56.1 Statement incorporate by reference the documents cited therein. Where facts stated in a party's 56.1 Statement are supported by testimonial or documentary evidence, and denied by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

On February 5, 2010, the DOE held a meeting of the Committee on Special Education ("CSE") to formulate LB's annual IEP for the 2010–2011 school year, as required by the IDEA, *see* 20 U.S.C. § 1414. Pl. 56.1 ¶ 11; Def. 56.1 ¶ 3. The CSE consisted of: FB and EB, LB's parents; Dr. Patricia Pape, a school psychologist for the DOE; Ellen Gordon, a special education teacher who was also serving in her capacity as district representative member of the CSE; Sandra Morabito, a district parent; and Karin Robertson, LB's Rebecca School teacher at that time, who participated by telephone. Def. 56.1 ¶ 4; IHO Tr. 19; DOE Ex. 3. At the meeting, the CSE consulted a number of reports on and evaluations of LB, including: LB's 2008–2009 IEP; LB's December 2009 progress report from Rebecca; and a classroom observation conducted on November 6, 2009. Def. 56.1 ¶ 6; SRO Dec. 13; IHO Tr. 22–23. The extent to which the CSE adequately consulted these documents, and whether or not it consulted certain other documents, including, most significantly, a 2009 psychoeducational update, is disputed. *See infra* § III(A)(1); *see also* SRO Dec. 13; *compare* Pl. 56.1 ¶¶ 21–23, *with* Def. 56.1 ¶ 6.

The recommendations that emerged from the CSE meeting were that: (1) LB be placed in a 12-month school-year program; (2) LB be placed in a special class with a 6:1:1 staffing ratio[2] within a specialized school; and (3) LB receive related services, including counseling, occupational therapy, speech and language therapy, and physical therapy. *See* DOE Exs. 1 & 2. Importantly, the parties do not dispute that the CSE did not conduct a functional behavior assessment ("FBA") of LB in advance of the meeting or that the CSE did not develop a behavior intervention plan ("BIP") for LB. *See* Pl. 56.1 ¶ 25; Def. Counter Statement ¶ 25.

On or around June 15, 2010, LB and the Parents received notice of LB's placement for the 2010–2011 school year, at P169M@P146M ("P.S. 169"). *See* Pl. 56.1 ¶ 51; Def. 56.1 ¶ 13;

---

[2] A 6:1:1 staffing ratio means that for every six students, there is one teacher and one classroom paraprofessional.

Pl. Counter Statement ¶ 9.  Before receiving that notification, however, the Parents had sent a letter to the CSE informing it that the DOE had failed to provide LB with a free appropriate public education, as required by the IDEA, and that they would therefore be unilaterally enrolling LB at the Rebecca School for the 2010–2011 school year and seeking reimbursement from the DOE.  *See* Def. 56.1 ¶ 13; Pl. Counter Statement ¶ 9; Pl. 56.1 ¶ 68.  On July 9, 2010, the Parents visited P.S. 169 to determine whether it was an appropriate placement for LB.  *See* Pl. 56.1 ¶¶ 51–52; Def. 56.1 ¶ 14.  The parents allege that the school was an inappropriate placement for LB and that the program proposed by the DOE was, *inter alia*, "grossly deficient with respect to addressing L[B]'s sensory needs."  Pl. 56.1 ¶ 44.  Thereafter, on July 20, 2010, the Parents sent another letter to the DOE, advising it of their concerns and reiterating their belief that the DOE had failed to provide a FAPE for LB and their intention to seek tuition reimbursement for LB's attendance at the Rebecca School during the 2010–2011 school year.

### B.  Due Process Complaint and Impartial Hearing

On October 21, 2010, the Parents filed a due process complaint, challenging the DOE's program on the grounds that: (1) the DOE had improperly refused to consider placing LB in a more restrictive program; (2) the February 5, 2010, CSE Review Team had not been duly constituted; (3) the DOE's recommendations had been improperly predetermined before the meeting; (4) the IEP that grew out of the CSE meeting was based on insufficient and/or unreliable evaluative information; (5) the IEP's proposed goals were insufficient and inappropriate; (6) the IEP's proposed goals could not be implemented in the program that the DOE recommended; (7) the IEP improperly lacked a provision for transitional support services to aid LB in the transition from the Rebecca School to the DOE's recommended program; (8) the DOE failed to conduct a FBA in advance of the meeting; (9) the DOE failed to consider whether

to develop and include a BIP in the proposed IEP; (10) the DOE's recommended placement was inappropriate; (11) the CSE failed to consider whether to recommend sufficient related services for LB; and (12) the Parents were denied the right to meaningfully participate in planning for LB's education. *See* Parents' Ex. A3–A10.

An impartial hearing began on March 11, 2011, and concluded on June 10, 2011. *See* IHO Tr.; Def. 56.1 ¶ 29. At that hearing, the IHO held that the DOE had not provided LB with a FAPE. The IHO granted the Parents' request for tuition reimbursement for the 2010–2011 school year, on the grounds that: (1) the CSE had not consulted sufficient evaluative data on which to base LB's 2010–2011 IEP (in particular, because the record did not show that the CSE reviewed the 2009 psychoeducational update, *see* IHO Dec. 5); (2) the CSE had not conducted a FBA and developed a BIP for LB, *see id.* at 5–6; and (3) the IEP failed to provide for parent counseling and training, *see id.* at 6. The IHO held that the Rebecca School was an appropriate unilateral placement for LB, *see id.* at 8, and that the equities favored the Parents in the matter, *see id.* at 9.

### C.  SRO Appeal

The DOE appealed the IHO Decision to the State Review Officer ("SRO"). Addressing the three points on which the IHO had relied, the DOE argued that: (1) it in fact had based the IEP on sufficient evaluative data and information; (2) the absence of a FBA and a BIP did not result in the denial of a FAPE to LB; and (3) the IEP's failure to provide for parent counseling and training did not rise to the level of denial of a FAPE. In its Petition to the State Review Officer ("Petition"), the DOE also addressed the remaining issues in the Parents' due process complaint that the IHO had not reached. Specifically, DOE argued that: (1) the CSE had been properly constituted; (2) the Parents could have provided LB's current teacher with the materials

she needed to participate in the CSE meeting; (3) the program recommendation had not been predetermined; (4) the lack of transitional support services did not amount to denial of a FAPE; (5) the Parents' claims regarding the offered placement were all "speculative, as they never accepted the offered placement and the IEP was never implemented"; and (6) LB would have received related services at P.S. 169. *See* Petition ¶¶ 39–46. The DOE further argued that the Rebecca School was not an appropriate placement for LB, *id.* ¶¶ 47–52, and that equitable considerations precluded reimbursement, most notably because "[r]espondents [the Parents] did not intend to send their child to public school," *id.* ¶ 35.

The SRO overturned the IHO's decision. He found that: (1) the CSE based its IEP on sufficient evaluative data of LB to develop "an IEP that accurately reflected [his] special education needs," SRO Dec. 14; (2) the CSE was not required to conduct a FBA or develop a BIP, because the hearing record demonstrated that LB's behavior "did not seriously interfere with instruction and could be addressed by the special education classroom teacher," *id.* at 17; and (3) the failure of the IEP to include parent counseling and training did not amount to denial of a FAPE, because the record reflected that "the assigned school would have provided this service," *id.* at 18. The SRO also held that the various claims the Parents had made in their due process complaint that the IHO did not address in his decision had not been preserved for his review by the Parents, because they had not cross-appealed the IHO's decision. *See id.* at 12. These were that (1) the CSE improperly refused to consider placement in a more restrictive program; (2) the CSE was improperly constituted, because the district representative and special education teacher were unqualified to fulfill their roles on that committee; (3) LB's teacher, Karin Robertson, was denied the opportunity to participate meaningfully in the meeting, because the CSE had not provided her with access to the materials being considered; (4) the CSE's

recommendations were predetermined; (5) the goals of the IEP were insufficient; (6) the annual

goals in the IEP were not individually tailored to address LB's educational deficits; (7) the goals

of the IEP lacked adequately objective criteria to measure LB's progress; (8) many of the goals

in the IEP could not have been implemented in the recommended program; (9) the IEP should

have included transitional support services to aid LB in moving from the Rebecca School to P.S.

169; and (10) P.S. 169 was not an appropriate placement.

### D.  Procedural History

On March 7, 2012, having thus exhausted the administrative process as required, the

Parents filed the Complaint in this case.  Dkt. 1.  On August 31, 2012, the Parents filed a motion

for summary judgment.  Dkt. 17.  In support, on September 4, 2012, the Parents filed an

Affidavit of Steven Goldstein, Dkt. 21, a memorandum of law ("Pl. SJ Br."), Dkt. 23, and their

Local Rule 56.1 Statement of Material Facts, Dkt. 22.

On October 12, 2012, the DOE filed its own motion for summary judgment, Dkt. 25, an

accompanying memorandum of law addressing the parties' respective such motions ("Def. SJ

Br."), Dkt. 27, its Local Rule 56.1 Statement of Material Facts, Dkt. 26, and its Counter

Statement to Plaintiffs' Local Rule 56.1 Statement of Material Facts ("Def. Counter Statement"),

Dkt. 28.  On November 30, 2012, the Parents filed their Counter Statement to Defendants' Local

Rule 56.1 Statement of Material Facts ("Pl. Counter Statement"), Dkt. 30, and their opposition to

the DOE's motion for summary judgment ("Pl. Opp. Br."), Dkt. 31.  On December 12, 2012, the

DOE filed its reply to the Parents' opposition brief ("Reply Br."), Dkt. 32.  On January 9, 2013,

the Court held extended argument on the parties' motions for summary judgment.

## II.   Applicable Legal Standards

### A.  Legal Framework

The IDEA requires a state that receives federal funding to provide all children with disabilities a "free appropriate public education."  20 U.S.C. § 1412(a)(1)(A); *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005).  A FAPE should "emphasize[] special education and related services designed to meet [a disabled child's] unique needs and prepare [the child] for further education, employment, and independent living."  20 U.S.C. § 1400(d)(1)(A).  To do that, the DOE must develop an IEP for each disabled child, "set[ting] out the child's present educational performance, establish[ing] annual and short-term objectives for improvements in that performance, and describ[ing] the specially designed instruction and services that will enable the child to meet those objectives."  *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see also* 20 U.S.C. § 1414(d)(1)(A); *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 415 (2d Cir. 2009).  The IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982); *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (citing *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

New York law charges a CSE with developing an IEP for a disabled child.  N.Y. Educ. Law § 4402(1)(b)(1); *see also R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012); *Walczak*, 142 F.3d at 123.  The CSE must consist of: the parents of the student in question; the student's regular or special education teacher; a school psychologist; a district representative "qualified to provide or administer or supervise special education and . . . knowledgeable about the general curriculum and the availability of resources of the school district"; and an additional parent representative, among others.  N.Y. Educ. Law § 4402(1)(b)(1)(a).

When a parent believes that the state has failed to offer his or her child a FAPE, the parent may unilaterally place the child in a private school and seek reimbursement from the school district. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 247 (2009); *see also M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012); *Cerra*, 427 F.3d at 192. The parent must then file a due process complaint which challenges the appropriateness of the IEP. A hearing on that complaint is then held before an IHO. N.Y. Educ. Law § 4404(1). At that hearing, the DOE must show that the program recommended by the IEP was appropriate to meet the child's needs. If the DOE cannot meet that burden, "the burden shifts to the parents to demonstrate that the school in which they have chosen to enroll their child is appropriate," *M.H.*, 685 F.3d at 246 (citing *Gagliardo*, 489 F.3d at 112), and that equitable factors weigh in favor of reimbursement. *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359 (1985); *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363–64 (2d Cir. 2006); *B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 8433 (JSR), 2012 WL 6691046, at *2 (S.D.N.Y. Dec. 26, 2012). A party aggrieved by an IHO's decision may appeal to an SRO. 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2). An appeal from the decision of an SRO may be brought as a civil action in federal or state court. 20 U.S.C. § 1415(i)(2)(A); N.Y. Educ. Law § 4404(3).

### B.  Standard of Review

Summary judgment in the context of an IDEA case "involves more than looking into disputed issues of fact; rather, it is a 'pragmatic procedural mechanism' for reviewing administrative decisions." *R.E.*, 694 F.3d at 184 (citing *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009)). "The role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed. While the district court must base its decision on the

preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C.*, 553 F.3d at 171 (citations and alterations omitted). When the decisions of an IHO and a SRO conflict, the Court should generally defer to the SRO's decision, as the "final decision of the state authorities," *R.E.*, 694 F.3d at 189 (citing *A.C.*, 553 F.3d at 171), particularly "when the state officer's review 'has been thorough and careful,'" *id.* at 184. But when "the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges." *Id.* at 189 (citing *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012)). Determinations that involve the substantive adequacy of an IEP and educational methodologies are to be given more weight than determinations about the procedure according to which an IEP was developed or whether objective indications of a student's progress exist. *See M.H.*, 685 F.3d at 244.

## III.    Discussion

### A.  The SRO's Findings Are Persuasive and Merit Deference

#### 1.  The SRO's Finding that the CSE Based the IEP on Sufficient Evaluative Data

The Parents argue that the CSE, in formulating LB's IEP, did not properly consider the evaluative data available to it. *See* Pl. SJ Br. 11–14. They contend that "the CSE team made only a cursory review of L[B]'s file" and that "[t]he checklist of documents purportedly relied upon by the CSE team is nowhere to be found in the IEP, nor anywhere else in the record." *Id.* at

12–13.  The Parents argue that the CSE made "little more than an admittedly superficial review of L[B]'s file and a brief classroom visit" and thus "could not have possibly comprehended L[B]'s needs in a way that was meaningful, and could not have developed an education program designed to address his unique needs."  *Id.* at 13.  And because the IEP was, purportedly, not based on current evaluations, the Parents argue, "it was incapable of describing, and in fact did not describe, an appropriate program and placement for L[B]."  *Id.* at 13 (citing *Davis v. Wappingers Cent. Sch. Dist.*, 431 F. App'x 12, 15 (2d Cir. 2011) (affirming district court's finding of denial of a FAPE based on, among other things, SRO's finding that the CSE failed to consider appropriate evaluative data).

More specifically, the Parents argue that the CSE failed to consider the February 2009 psychoeducational update that they had obtained to assess LB's current levels of cognitive and behavioral functioning and developmental progress.  *See* Pl. 56.1 ¶¶ 21–22; Pl. SJ Br. 11–13; Compl. ¶¶ 34–35.  That assessment had been conducted by Dr. David Salsberg, Supervisor of Pediatric Psychology at the Rusk Institute of Rehabilitative Medicine at the New York University Langone Medical Center.  It reflected the most recent such evaluation of LB.  In the final section of that report, entitled "Recommendations," Dr. Salsberg stated:

> Since [LB] is clearly benefiting from the individualized attention and relational approach offered at his current school, it is strongly recommended that he continue to attend the Rebecca School.  In order for him to make appropriate progress in areas of cognitive, language, and social development, it is essential that he receive the continued individualized instruction and therapeutic services that the school offers.

Parents' Ex. L. at 5.  The Parents also argue that the CSE failed to consider a physical therapy ("PT") report conducted on June 8, 2009, which indicated that LB should continue to receive physical therapy.  *See* Pl. 56.1 ¶¶ 21–22; Pl. SJ Br. 11–13; Compl. ¶¶ 34–35.  In support of this

assertion, the Parents note that the minutes of the CSE meeting state that "we do not have that report."  *See* DOE Ex. 2 at 2.

The DOE counters that the Parents are factually wrong.  It asserts that, fairly analyzed, "the hearing record demonstrates that the CSE relied on multiple reports on and evaluations of LB in developing the IEP, including (1) LB's 2009–10 IEP; (2) a November 2009 classroom observation, conducted by Ellen Gordon, the DOE special education teacher who attended the meeting; (3) a June 2009 physical therapy evaluation completed by the DOE; and (4) a December 9, 2009 interdisciplinary progress report from Rebecca that listed LB's current goals and described his functioning based on input from his classroom therapist, occupational therapist, physical therapist, speech-language pathologist, and music and art therapists."  Def. SJ Br. 9 (citations omitted).  It is undisputed that Dr. Pape reviewed many of the documents at issue, including evaluative documents, and Dr. Pape did not testify that she did not read the February 2009 psychoeducational update.  On the contrary, her testimony was that she "must have" read it.  Instead, the DOE explains, the Parents are seizing on the unimportant fact that Dr. Pape did not physically bring that report to the CSE meeting.  *See* Def. 56.1 ¶ 6.  Furthermore, the DOE notes, "[p]laintiffs do not point to any specific information in the IEP regarding [LB's] instructional or performance levels that they believe to be inaccurate or that should have been different based on information contained in the February 2009 psycho-educational update."  Def. SJ Br. 10.  And, as to the PT report, the DOE argues, "it is obvious from a review of the IEP that the CSE team had the PT report and incorporated very specific information from the report into the IEP.  In fact, language from the PT report appears verbatim at various points in the IEP."  *Id.*  Accordingly, the DOE argues, it is clear that the CSE in fact considered the PT report.  *Id.*

In addressing this issue, the IHO found that the CSE had not considered sufficient evaluative data in formulating LB's IEP.  IHO Dec. 5.  In the single paragraph he devoted to that subject, the IHO explained that the record before the CSE, although showing that the CSE had relied on teacher reports prepared by the Rebecca School, "does not show that the CSE reviewed and/or relied upon the most recent cognitive and academic testing at the time of the CSE[, t]o wit, the psycho-educational update" as to LB dated February 17, 2009, which Dr. Salsberg had conducted.  *Id.*  The IHO noted that Dr. Pape, at the impartial hearing, had testified specifically that she had looked at LB's PT reports; otherwise, however, she had been unspecific about what she had reviewed, stating, "We kind of reviewed the file, so I may have looked at other documents, but the specific documents that we did use, they're on the checklist, and what we included in that and with the observation, and teacher progress report, and the PT report, and that was it."  IHO Tr. 22–23.  Further, the IHO stated, the record did not demonstrate that Dr. Pape, or any other member of the CSE, had reviewed the February 17, 2009 psychoeducational update, which recommended that LB continue at the Rebecca School.  IHO Dec. 5.  Rather, the IHO noted, when asked whether she had considered a psychological or psychoeducational evaluation, Dr. Pape had stated that she had not brought that update to the CSE's meeting.  *Id.* (citing IHO Tr. 74).[3]

The SRO reached the opposite conclusion.  He acknowledged that "the hearing record is equivocal regarding whether the February 2010 CSE reviewed and/or relied upon the February 2009 psychoeducational update."  But, the SRO reasoned, for several reasons, that shortcoming in the record does not mean that "the evaluative information upon which the February 2010 IEP

---

[3] The IHO discounted the fact that Dr. Pape's referral form included data relating to LB's cognitive levels, noting that the DOE had acknowledged, in a post-hearing brief, that that data had been added only after the CSE meeting.  IHO Dec. 5.

was based was inadequate." SRO Dec. 13.  First, Dr. Pape, the district psychologist, had not

denied reading the February 2009 psychoeducational update; rather, she testified, she must have

reviewed it, but had not brought it to the CSE meeting.  *Id.* at 13 n.5.  Second, as Dr. Pape's

testimony revealed, by the time it acted, the CSE had reviewed a number of evaluations and

assessments.  These included:  LB's 2009–2010 IEP; a November 2009 classroom observation of

LB; the June 2009 PT evaluation; and a December 2009 interdisciplinary progress report from

the Rebecca School that in turn described LB's current functioning and goals, based on the input

of his classroom teacher, occupational therapist, physical therapist, speech-language pathologist,

and music and art therapists.  SRO Dec. 13.  Third, the SRO noted, "the hearing record reflects

that the February 2010 CSE utilized information from the aforementioned reports to develop

[LB]'s IEP."  This included information "gleaned from the December 2009 Rebecca School

progress report," and from the CSE's discussion with LB's teacher.  *Id.* at 14.  For these reasons,

the SRO found, "the district had sufficient information relative to the student's present levels of

academic achievement and functional performance—including the teacher estimates of the

student's current skill levels—at the time of the CSE meeting to develop an IEP that accurately

reflected the student's special education needs."  *Id.*

      The Court finds the SRO's analysis persuasive, in contrast to the cursory analysis of the

IHO.  The Parents' critiques of the SRO's reasoning gain little if any traction.  The Parents first

assert that the SRO's findings are not entitled to deference on this point, but they make only the

conclusory claim that, because the SRO's findings conflict with those of the IHO, the SRO's

findings are "unfounded by the evidence and not entitled to deference."  Pl. SJ Br. 13.  The

Parents do not, however, point to any specific fact that the SRO overlooked, nor any specific

error by the SRO in his determination.

The Parents next observe, correctly, that the IHO was responsible in the first instance for assessing Dr. Pape's credibility. But the SRO's reversal of the IHO's decision did not turn on a differing view of Dr. Pape's credibility. On the contrary, the one factual point to which Dr. Pape attested and on which the IHO relied—that Dr. Pape did not physically bring the February 2009 psychoeducational update to the CSE's meeting—was acknowledged by the SRO. However, the SRO found that fact to be of little moment, given Dr. Pape's testimony that she "must have" reviewed the update, and, more important, given the substantial materials in the case supporting the CSE's conclusion.

More generally, the Second Circuit has instructed that deference to an SRO "is particularly appropriate when . . . the state hearing officers' review has been thorough and careful" and is "reasoned and supported by the record." *Walczak*, 142 F.3d at 129; *see also M.H.*, 685 F.3d at 241; *J.F.*, 2012 WL 5984915, at *6 (adding that "[t]he SRO is required to render a carefully considered opinion; not a perfect one" and that "to refuse to defer to the SRO on the basis of [insubstantial errors] would be effectively to eliminate deference to the SRO altogether"). Such is the case here. The SRO rendered a thorough analysis of the record and persuasively explained why the evaluative data which the CSE had access to, and reviewed, was a sufficient basis on which to base LB's IEP. Significantly, the Parents have not identified particular errors by the SRO, but instead register an overarching disagreement with the SRO's bottom-line conclusion. Denying deference to the SRO without more concrete bases for assailing its conclusions would be inconsistent with the maxim that, where an IHO and an SRO reach conflicting conclusions, courts should usually defer to the SRO. *See, e.g.*, *R.E.*, 694 F.3d at 189.

15

In seeking to unsettle the SRO's finding, the Parents dominantly rely on the supposition that, because the February 2009 psychoeducational update was not physically present at the CSE meeting, it was never consulted by any party to that meeting. But for several reasons, the fact of the update's absence at the meeting does not carry the day. First, as noted, Dr. Pape testified that, per her customary practice, she "must have" reviewed that update. The Parents have not offered any basis to challenge that testimony. Second, beyond the fact that that update favored placement at the Rebecca School, the Parents have not identified any facts or reasoning in it that were not also reflected in the other, substantial materials considered by the CSE (and later by the SRO). Third, and finally, the evidence reflects that the CSE thoughtfully considered voluminous evaluative material, amply sufficient to satisfy the IDEA. The IDEA requires those formulating a student's IEP to "review existing evaluation data on the child, including (i) evaluations and information provided by the parents of the child; (ii) current classroom-based, local, or State assessments, and classroom-based observations; and (iii) observations by teachers and related services providers . . . ." 20 U.S.C. § 1414(c)(1)(A). It does not require that the team review every single item of data available, nor has case law interpreted it to mean such. *See, e.g.*, *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003) ("not . . . every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA"); *J.F.*, 2012 WL 5984915, at *7 (characterizing as sufficient multiple school reports; speech, language, occupational therapy and social history reports; and classroom observations); *cf. Mackey v. Bd. of Educ.*, 373 F. Supp. 2d 292, 299 (S.D.N.Y. 2005) ("IDEA does not compel a school district to perform every sort of test that would arguably be helpful before devising an IEP for a student."); *Connor v. N.Y.C. Dep't of Educ.*, No. 08 Civ. 7710 (LBS), 2009 WL 3335760, at *5 (using "multiple tools and various observations to conduct an up to date analysis of the child's behavior

and psychological needs" sufficient in creating IEP).  Here, the SRO's finding that the CSE relied on sufficient evaluative data in creating LB's IEP is supported by the record below.  The Court, accordingly, declines to disturb that finding of the SRO.

### 2.  The SRO's Finding that the CSE's Failure to Conduct a FBA and Develop a BIP Did Not Deny LB a FAPE

The Parents next argue that, in failing to conduct a functional behavior assessment and develop a behavior intervention plan, despite what the Parents assert were "strong indications of the need for them," the DOE denied LB a FAPE.  Pl. SJ Br. 14–16; Pl. 56.1 ¶¶ 25–26, 29; Compl. ¶ 38.

In support of this argument, the Parents note that LB's report from the Rebecca School stated that, because of his over-responsive sensory profile, LB "can become dysregulated with loud auditory input," in response to which he covers his ears.  Further, the report stated, "[i]f dysregulated and presented with a loud stimuli [*sic*] L[B] can become aggressive and strike out against adults and peers."  Ex. N at 5.  Specifically, "when in proximity to a loud peer, especially if the child is crying or upset, L[B] may become dysregulated.  When dysregulated, L[B] will cover his ears and may scream.  In some situations, L[B] may attempt to squeeze or scratch at a trusted adult or the upset child."  *Id.* at 1.  The Parents argue that LB's aggressive behaviors when dysregulated interfere with his ability to learn.  Because the CSE was made aware of those behaviors, they argue, it should have conducted a FBA to develop an appropriate BIP.

The DOE, for its part, acknowledges that the CSE neither conducted a FBA nor developed a BIP.  It argues, however, that, as the SRO held, the CSE was not required to do so, Def. SJ Br. 11–13, because LB's periods of dysregulation "did not significantly impede his ability to benefit from instruction."  *Id.* at 12.  Furthermore, the DOE notes, the IEP included strategies aimed at helping LB to maintain composure and attentiveness.  And even if the CSE

had been required to conduct a FBA and create a BIP, the DOE argues, the failure to do so did

not rise to the level of denial of a FAPE, because "the CSE was familiar with the student's

behavioral needs and took them into account in formulating the IEP, which accurately reflected

and addressed those needs." *Id.* at 12.

Under New York regulations, a CSE must, "in the case of a student whose behavior

impedes his or her learning or that of others, consider strategies, including positive behavioral

interventions, and supports and other strategies to address that behavior . . . ." N.Y. Comp.

Codes R. & Regs. tit. 8 § 200.4(b)(1)(v). These strategies include a FBA, which is intended to

"determin[e] why the student engages in behaviors that impede learning and how the student's

behavior relates to the environment . . . . The [FBA] shall include . . . the identification of the

problem behavior, the definition of the behavior in concrete terms, the identification of the

contextual factors that contribute to the behavior[,] . . . and the formulation of a hypothesis

regarding the general conditions under which a behavior usually occurs and probable

consequences that serve to maintain it." *Id.* § 200.1(r). Where the student's behaviors impede

his or her learning or the learning of his or her peers, a BIP should set out "intervention strategies

to be used to alter antecedent events to prevent the occurrence of the behavior, teach individual

alternative and adaptive behaviors to the student, and provide consequences for the targeted

inappropriate behavior(s) and alternative acceptable behavior(s)." *Id.* § 200.22(b)(4)(ii).

Notwithstanding those requirements, the case law is clear that "a failure to conduct an

FBA is a procedural violation, but . . . it does not rise to the level of a denial of a FAPE if the IEP

adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at

190 (citing *A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172

(2d Cir. 2009) (failure to perform a FBA did not render IEP legally inadequate in light of IEP's

providing strategies to address child's behavior)); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584

F.3d 412, 419 (2d Cir. 2009) ("substantial evidence in the record" of ways to address

problematic behaviors provided a basis for SRO to conclude that, despite failure to conduct a

FBA or a BIP, a FAPE was not denied); *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, No. 11

Civ. 6459 (VB), 2012 WL 4714796, at *9 (S.D.N.Y. Sept. 26, 2012) ("Even if the evidence

supported a conclusion TM was a student who exhibited disruptive behavior that impeded his

learning or that of others, the absence of an FBA alone does not render the IEPs inadequate . . . .

The absence of an FBA will not render an IEP procedurally inadequate where . . . the IEP

explicitly considers behavioral strategies to address the interfering behaviors."); *cf. F.L. ex rel.*

*F.L. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 5131 (RKE), 2012 WL 4891748, at *8 (S.D.N.Y. Oct.

16, 2012) ("[E]ven when one is required, the failure to conduct a FBA will not render an IEP

legally inadequate where . . . the IEP adequately addresses the student's problem behavior

through a BIP.").

　　　　In this case, measuring the record evidence against these standards, the SRO's finding

that the lack of a FBA and a BIP did not deny LB a FAPE is persuasive and merits deference.

First, the SRO's conclusion that LB's behavior could be addressed by the special education

classroom teacher and did not seriously interfere with instruction so as to require a FBA and a

BIP, is supported by the record.  Most notably, the record evidence includes:

> (1) <u>LB's Rebecca School Interdisciplinary Report</u>.  It states that LB's periods of
> dysregulation typically last less than one minute, *see* Ex. N at 1; and that LB was
> making progress in that regard.  *See* Ex. N. at 5 ("L[B] continues to present with an
> over responsive sensory profile however he is making progress modulating his
> response to sensory input . . . . In the past [he] automatically covered his ears in
> response to loud input and was untrusting of his environment keeping his hands in his
> ears for the majority of the day.  Now, he rarely covers his ears which allows him to
> answer questions, follow directions more readily, and process auditory input more
> regularly.");

(2) <u>The testimony of Tina McCourt, the program director at the Rebecca School</u>.  She testified that LB's episodes of dysregulation had "[s]ignificantly, significantly decreased. . . . We do not see it anywhere in [*sic*] the same number of times or even in the same duration."  IHO Tr. 245; and

(3) <u>The testimony of Dr. Pape</u>.  In support of the CSE's recommendation, she testified that "the teacher … note[d] that these periods of disregulation were typically less than one minute," that LB "had made improvements in that area where they said he rarely covered his ears," and that, although the Parents felt that there had been "some backsliding recently," the school "still said that it did not seriously interfere with instruction."  IHO Tr. 39–40.

Furthermore, as the SRO noted, the source of LB's dysregulation "had already been identified as being related to his sensory processing deficits."  SRO Dec. 17.  It therefore followed that, in LB's case, at least one of the FBA's purposes—identifying the aggressive behavior's cause—had already been accomplished.  Finally, the IEP included strategies for addressing LB's behaviors, albeit not in the form of a BIP based on a FBA.  These included: "immediate access to sensory materials (e.g. pressure vest), sensory breaks, therapeutic listening, [and] access to a quiet space to retreat to when overwhelmed."  DOE Ex. 3 at 4.  In his decision, the SRO cited these "social/emotional management strategies to assist [LB] in maintaining appropriate regulation" as further obviating the need for a FBA and a BIP, or at least helping to mitigate the absence thereof.  SRO Dec. 17.

Based on that evidence, the SRO's conclusion comfortably meets the standard set by the Second Circuit: that it result from a logical, well-reasoned, and persuasive opinion.  In reaching this conclusion, the Court is also mindful that such decisions regarding educational methodology are entitled to more deference from courts, because of "administrative judges' greater institutional competence in matters of educational policy."  *R.E.*, 694 F.3d at 189 (citing *M.H.*, 685 F.3d at 244, 246).  Further, the SRO's opinion is more extensive and better-reasoned than the IHO's opinion, which on this point consisted of the conclusory statement that "the CSE

should have conducted and/or recommended that an FBA be conducted in order to develop an

appropriate Behavior Intervention Plan" because "the record shows the [*sic*] LB has significant

sensory issues that lead to interfering behaviors [and] contribute to his problems with

dysregulation."  IHO Dec. 5–6.  Deference to the SRO over the IHO is therefore warranted.

### 3. The SRO's Finding that the Lack of Parent Counseling and Training in the IEP Did Not Deny LB a FAPE

The Parents next contend that the SRO erred in overturning the IHO's finding that the

IEP failed to provide for parent counseling and training, and thereby denied LB a FAPE.  *See* Pl.

SJ Br. 21–22; Pl. 56.1 ¶¶ 35–36; Compl. ¶¶ 50–51.  In faulting the IEP, the Parents rely on the

testimony of Stephanie Silverman, who would have been LB's teacher had he attended P.S. 169,

to the effect that parent training is not generally offered at that school.  *See* IHO Tr. 136–37 ("Q:

[D]oes your school offer parent training?  A: No, unless it's requested by the parent.  Q: [H]ow

does that work, if it's requested?  A: They would talk to me and I would set it up.  Q: [I]s that

something that you do?  A: I can.  It's never been requested of me, but it's absolutely something

I can do.").  The DOE, for its part, acknowledges that the IEP ideally should have included

parent counseling and training.  However, it argues that this omission did not result in a denial of

a FAPE.  *See* Def. SJ Br. 13–14.

Under New York regulations, provision for parent counseling and training is to be made

in an IEP, "for the purpose of enabling parents to perform appropriate follow-up intervention

activities at home."  N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13.  "The recommended program

and services shall . . . indicate . . . the extent to which the student's parents will receive parent

counseling and training . . . when appropriate."  *Id.* at § 200.4(d)(2)(v)(b)(5).  These regulations

define such counseling and training as "assisting parents in understanding the special needs of

their child; providing parents with information about child development; and helping parents to

acquire the necessary skills that will allow them to support the implementation of their child's

individualized education program." *Id.* at § 200.1(kk).

The case law, however, as with the failure to conduct a FBA and a BIP, informs that the

lack of a provision in an IEP for parent counseling and training does not inherently result in the

denial of a FAPE.  The Second Circuit has explained:

> Although violating New York's regulations, the failure to include parent
> counseling in the IEP is less serious than the omission of an FBA. . . . [T]he
> presence or absence of a parent-counseling provision does not necessarily have a
> direct effect on the substantive adequacy of the plan.  Moreover, because school
> districts are required by section 22.13(d) to provide parent counseling, they
> remain accountable for their failure to do so no matter the contents of the IEP.
> Parents can file a complaint at any time if they feel they are not receiving this
> service. . . . Though the failure to include parent counseling in the IEP may, in
> some cases (particularly when aggregated with other violations), result in a denial
> of a FAPE, in the ordinary case that failure, standing alone, is not sufficient to
> warrant reimbursement.

*R.E.*, 694 F.3d at 191 (citations omitted); *see also K.L. ex rel. M.L. v. N.Y.C. Dep't of Educ.*, No.

11 Civ. 3733 (KBF), 2012 WL 4017822, at *14 (S.D.N.Y. Aug. 23, 2012) ("Even if when

included in the program itself, parent counseling must still be explicitly listed in the IEP, such a

procedural error is insufficient to amount to a denial of a FAPE.") (citing *M.N. v. N.Y.C. Dep't of*

*Educ.*, 700 F. Supp. 2d 356, 367–68 (S.D.N.Y. 2010) (provision for parent training was

unnecessary to satisfy the IDEA where such training was integrated at the placement)); *C.F. ex*

*rel. R.F. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 0157 (LTS), 2011 WL 5130101, at *10 (S.D.N.Y.

Oct. 28, 2011).  Thus, while a failure to provide parent counseling and training may—in

combination with other deficiencies—*contribute* to denial of a FAPE, *see K.L.*, 2012 WL

4017822, at *14, it alone is insufficient to rise to the level of denial thereof.

The Court's assessment is that the SRO's determination as to this point, as with the FBA

and BIP, merits deference.  The SRO reasonably determined that, even without an express IEP

provision to this effect, LB's parents would have received such services. The SRO appears to have credited the testimony of Denise Velazquez, P.S. 169's Parent Coordinator, to the effect that the school offers between 10 and 12 workshops a year and facilitates parental access to various other training resources.[4]   See IHO Tr. 166–69.  Having recapped the various avenues at P.S. 169 for parental training, the SRO concluded that "[u]nder the circumstances presented herein, given that parent counseling and training was available at the assigned school, I decline to find that the district's failure to incorporate it into the February 2010 IEP resulted in a denial of a FAPE to the student."  SRO Dec. 18.  The IHO's decision was spare.  It stated only:  "The IEP does not provide for parent counseling, nor does it provide parent training.  I find that the 'workshops' offered by the DOE based on the 'parents' interest' are insufficient to meet this mandate."  IHO Dec. 6.  As between the reasoning articulated by the IHO and SRO, here, too, the SRO's decision is far more thorough and persuasive in its analysis.  The Court therefore sees no reason to disturb the conclusion of the SRO.

    In addition to concluding that none of the deficiencies, viewed singly, denied LB a FAPE, the Court has also considered whether, in the aggregate, the absence of a FBA and BIP and the absence within the IEP of an express provision for parental counseling, cumulatively

---

[4] In considering this testimony as to what the proposed placement entailed, the Court is mindful that an SRO may not rely on "retrospective testimony," *i.e.*, as to what the school district would have provided, even if not listed in a student's IEP, that materially alters the IEP.  Such testimony may not be considered in a *Burlington/Carter* proceeding, because it may effectively allow "a school district [to] rehabilitate a deficient IEP after the fact."  *R.E.*, 694 F.3d at 186; *see B.R. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 8433 (JSR), 2012 WL 6691046, at *5 (S.D.N.Y. Dec. 26, 2012).  The testimony considered by the SRO here was not, however, of this nature.  It did not seek to plug a hole in an IEP by making an untestable claim as to an unwritten provision in an IEP.  Instead, it related the programs that in fact exist at P.S. 169.  The testimony thereby added definition to—it explicated—the P.S. 169 offering.  *See R.E.*, 694 F.3d at 191 (noting that parent counseling is required by law).  In any event, even if such testimony were not permissibly considered, the failure to include a provision for parent training does not itself—in general or on the facts here—deny the student a FAPE.  *Id.* at 194.

resulted in the denial of a FAPE.[5]  The Court holds that they did not.  On both points, the Parents

have identified deficiencies, but for the reasons explained above, they are more formal than

substantive.[6]

### B.  The SRO Incorrectly Excluded From the Scope of His Review the Challenges Brought by the Parents Not Addressed by the IHO

In his decision, the SRO addressed the three aspects of the IEP which the IHO had found

deficient, but he did not address the other issues which the Parents had raised before the IHO but

which the IHO had not reached.  *See* SRO Dec. 11.  For this reason, although the SRO's opinion

is persuasive and merits deference as to the three topics he did address, the incomplete scope of

the SRO's opinion prevents the Court from determining whether the overall IEP denied LB a

FAPE.  The SRO should have considered these additional contentions in his decision, and

because he did not, on the present record, summary judgment cannot be entered for either side as

to those issues.

Resisting this conclusion, the DOE argues that the Parents have forfeited the right to raise

these additional claims of deficiencies in the IEP.  The DOE notes that New York law prevents a

party from "rais[ing] substantive issues at the SRO level in an answer that lack[s] a cross-

appeal."  *See* Def. SJ Br. 6–7.  On this basis, the DOE asserts, the Parents, before the SRO, were

obliged to cross-appeal, even though the IHO had ruled in their favor on all three substantive

issues that he reached and had held that the DOE was required to reimburse the Parents for LB's

tuition at the Rebecca School.  Because the Parents did not cross-appeal to pursue their claims

not reached by the IHO, the DOE contends, the DOE had no opportunity before the SRO to

---

[5] The Parents' third contention, relating to the CSE's alleged failure to consider the February 2009 update, is procedural, not substantive, in nature.

[6] Because the Court has not found a denial of a FAPE, the Court has no occasion to reach the next two prongs of the *Burlington/Carter* analysis—whether the Rebecca School constituted an appropriate placement for LB and whether the equities favor the Parents.

respond to these claims.  Def. SJ Br. 6.  The DOE acknowledges that this theory of forfeiture is

an "exception to the general principle that a party not aggrieved by a decision may not cross-

appeal from it," Def. SJ Br. 6–7, but contends that its position is supported by *C.F.*, 2011 WL

5130101, at *12 ("Any aspects of the IHO's decision that were not appealed to the SRO are now

final and binding on the parties.").  In so arguing, the DOE concedes that the Parents could not

have "*initiated* an appeal from the IHO's decision because they were not aggrieved by it," but

asserts that once the DOE  appealed from the IHO decision, the Parents, to preserve an issue for

review, were duty-bound to file a cross-appeal with the SRO as to any element of the IHO's

decision not resolved in their favor, including his decision not to address a particular issue for

review.  Reply Br. 2 (emphasis in original).

        In response, the Parents explain that they did not file a cross-appeal to the IHO's decision

because, quite simply, "they were not aggrieved by it."  Pl. SJ Br. 4.  They dispute as at odds

with well-settled law the SRO's claim that they were obliged to cross-appeal as to issues the IHO

did not reach.  *See* Pl. SJ Br. 4–5 (citing *Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 333

(1980) ("The Supreme Court has held that a 'party who receives all that he has sought generally

is not aggrieved by the judgment affording the relief and cannot appeal from it.'")); *see also*

*Mass. Mut. Life Ins. Co. v. Ludwig*, 426 U.S. 479, 481 (1976) ("[A]ppellee may, without taking a

cross-appeal, urge in support of a decree any matter appearing in the record, although his

argument may involve an attack upon the reasoning of the lower court or an insistence upon

matter overlooked or ignored by it."); *Bausch Lomb Inc. v. C.I.R.*, 410 F. App'x 367, 370 (2d

Cir. 2010) ("[A] party who receives all that he has sought generally is not aggrieved by the

judgment affording the relief and cannot appeal from it." (citation omitted))).  The Parents note

that the New York Court of Appeals has defined "aggrieved" as not applying to a party that has

successfully obtained a judgment in its favor.  *See Parochial Bus Sys. v. Bd. of Educ. of City of N.Y.*, 60 N.Y.2d 539, 544–45 (1983) ("Where the successful party has obtained the full relief sought, he has no grounds for appeal or cross appeal.  This is so even where that party disagrees with the particular findings, rationale or opinion supporting the judgment or order below in his favor, or where he failed to prevail on all the issues that had been raised." (citations omitted)).  The Parents argue, in fact, that not only were they not *obligated* to cross-appeal the IHO's decision—they were precluded from doing so.  Pl. SJ Br. 5–6.  Finally, the Parents note, the DOE was fully capable of thoroughly addressing these issues before this Court, with both parties having briefed them before the IHO and, in large measure, the SRO.  Pl. SJ Br. 4.  In sum, the Parents argue, there is no reason here to require them to have cross-appealed any part of the IHO's decision.

The Court agrees with the Parents that their claims as to other deficiencies in the IEP are preserved for review.  An appeal to an SRO may be taken by "[a]ny party aggrieved by the findings of fact and the decisions of an impartial hearing," N.Y. Comp. Codes R. & Regs. tit. 8 § 200.5(k)(1), and "a respondent who wishes to seek review of an impartial hearing officer's decision may cross-appeal from all or a portion of the decision by setting forth the cross-appeal in respondent's answer," *id.* § 279.4(b).  Because the IDEA requires that parties exhaust their administrative remedies before appealing a decision of the state administrative officers to the district court, *see* 20 U.S.C. § 1415(l), these provisions of New York law must be interpreted in order for district courts to decide whether parties have exhausted their administrative remedies.  *See Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 483 (2d Cir. 2002); *J.F.*, 2012 WL 5984915, at *9.

Although the case law in this area is not uniform, as reflected in *C.F.*, the Court finds the approach taken by other courts in this District, and endorsed by the Parents here, most logical. Judge Forrest's recent decision in *J.F.* interpreted these regulations in an eminently sensible manner:

> Despite non-binding authority permitting the cross-appeal of an IHO's failure to decide an issue, this Court declines to adopt such a reading. . . . The parties do not cite to (and this Court has not found) any legislative history or binding interpretations of the relevant statutes or regulations suggesting this language should not be given its ordinary meaning.  The ordinary meaning of "aggrieved" implies harm, not merely failure to help.  In many cases (and in this case), an IHO's failure to decide an issue *for or against* a party does not "aggrieve" that party in the ordinary sense of that word.  Moreover, the phrase "all or a portion of the decision" implies that cross-appeals lie only from issues decided, not merely from silence.  The Court therefore finds that a party's failure to cross-appeal an issue never reached by the IHO does not necessarily constitute a waiver of its rights to pursue that issue.

*Id.* at *9 (citations omitted) (emphasis in original).  This case is on all fours with *J.F.*  The IHO's failure to reach additional claims of the Parents did not "aggrieve" the Parents, because the IHO found in their favor that the DOE had denied LB a FAPE and that the Parents were entitled to tuition reimbursement.  Unlike in a case "where a failure to decide an issue aggrieves a party," *see id.* at *10, the Parents' failure to cross-appeal an issue not addressed by the IHO one way or the other does not and should not prevent that issue from being preserved for review by the SRO. *See also D.N. v. N.Y.C. Dep't of Educ.*, No. 11 Civ. 9223 (NRB), 2012 WL 6101918, at *5 (Dec. 10, 2012) ("In this case, . . . the Parent received precisely the relief she sought: reimbursement for the Student's unilateral placement at the Rebecca School.  Therefore, the Parent was not aggrieved, and she 'had neither the responsibility nor the right' to cross-appeal any portions of the IHO's decision." (citing *Antkowiak by Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1998))); *R.B. ex rel. L.B. v. Bd. of Educ. of N.Y.*, 99 F. Supp. 2d 411, 415 (S.D.N.Y. 2000) (plaintiff not required to appeal a hearing officer's decision where plaintiff prevailed at the

impartial hearing, in which officer affirmed classification and placement of student; court explained that "there was nothing for plaintiff to appeal").

Finally, this construction does not carry with it the practical problems identified by the DOE. Where the DOE appeals an IHO determination and a respondent parent does not cross appeal, the DOE is at liberty to "preemptively address the [parents'] alternative claims in its own petitions." *D.N.*, 2012 WL 6101918, at *5 n.6. And, in both *D.N.* and in this case, the DOE did so. Further, as the *J.F.* court noted, the SRO "retains the ability to remand matters to the IHO" where a respondent fails to cross-appeal a matter to which petitioner has not had the appropriate opportunity to respond. *J.F.*, 2012 WL 5984915, at *9 n.4.

For the foregoing reasons, the Court holds that the Parents were not required to cross-appeal issues raised in their due process complaint but not addressed by the IHO in his decision ruling in their favor. The SRO, therefore, erred in excluding those issues from consideration when he determined whether LB had been denied a FAPE.

### C. Remaining Challenges to the IEP

The claims that the Parents raised before the IHO but were unaddressed by the SRO are that: (1) the DOE improperly refused to consider placing LB in a more restrictive program; (2) the February 2010 CSE was improperly constituted; (3) the CSE's recommendations were predetermined without parental input; (4) the goals were insufficient, inappropriate, and would not allow LB to make meaningful progress across all domains; (5) alternatively, the proposed goals could not have been implemented in the recommended program; (6) the February 2010 IEP should have included transitional support services to allow LB to move from the Rebecca School to the provided placement; (7) the assigned school was inappropriate; (8) the CSE failed to consider whether to recommend sufficient related services for LB; and (9) the parents were

denied meaningful parent participation.  The Court is ill-equipped to address these claims in the

first instance.  The Court instead remands them to the SRO to consider, based on the voluminous

record created during the administrative process.  *See D.N.*, 2012 WL 6101918, at *5 ("[R]ather

than reaching the merits of the unreviewed claims, we remand this matter to the SRO, who is

'uniquely well suited to review the content and implementation' of the student's IEP." (citing

*Polera*, 288 F.3d at 287)); *N.Y.C. Dep't of Educ. v. V.S.*, No. 10 Civ. 5120 (JG) (JO), 2011 WL

3273922, at *11 (E.D.N.Y. July 29, 2011) ("[R]emand is appropriate where the district court has

received insufficient guidance from state administrative agencies as to the merits of a case.").

The SRO should address these claims in accordance with the *Burlington/Carter* framework, the

first prong of which inquires whether these claims, singly or together,[7] deprived LB of a FAPE.

Without limiting the scope of the SRO's determination, the Court observes that the Parents'

claims that the IEP was substantively inadequate, and that the DOE's recommended placement

was not equal to the task of satisfactorily educating LB, merit close and thoughtful attention.

## CONCLUSION

For the foregoing reasons, the Court grants summary judgment in favor of the DOE with

regard to the three specific challenges brought by the Parents and addressed by both the IHO and

the SRO:  whether (1) the CSE based the IEP on sufficient evaluative data, (2) the failure of the

CSE to conduct a FBA and develop a BIP denied LB a FAPE, and (3) the lack of a parent

counseling and training provision in the IEP denied LB a FAPE.  The Court, however, denies

---

[7] In granting summary judgment for the DOE as to the three claims addressed by the SRO, the Court has held that these three claims, considered singly and together, did not deprive LB of a FAPE.  The Court is mindful, however, that "multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not" and "even minor violations may cumulatively result in a denial of FAPE."  *See R.E.*, 694 F.3d at 190–91.  Therefore, in its review on remand, to the extent it finds additional violations or deficiencies that do not themselves amount to a denial of a FAPE, the SRO must consider whether the violations found (including those addressed above) *cumulatively* resulted in the denial to LB of a FAPE.

summary judgment to both parties on the broader issue of whether the overall IEP denied LB a

FAPE, concluding that judicial resolution of such claims is premature until the SRO has

addressed the remaining challenges to the IEP raised before, but not addressed by, the IHO. The

Court thus remands this matter to the SRO, to complete his review of the Parents' claims,

consistent with the foregoing discussion. The Clerk of Court is directed to terminate the motions

pending at docket numbers 17 and 25.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: February 14, 2013
       New York, New York